The 4th District Appellate Court of the State of Illinois has now convened. The Honorable Craig H. D. Armon presiding. Good morning, counsel. Our case today is 4-25-0604, 3 Magpies, Inc., Appalee v. UEP Investments 2, LLC. Counsel for the attendant, please state your name for the record. Your Honor, Jeff Orduno for UEP Investments 2, LLC. Thank you, counsel. And counsel for the appellee, could you please state your name for the record. Good morning, Your Honor. Andrew Merzenich on behalf of the appellee. All right. Thank you. Counselor, you may proceed. Thank you, Your Honor. May it please the Court. There are five issues that would suggest that this case should be reversed. I'm going to take them in a slightly different order than they were in the brief. I'm going to try and work through them essentially in the order that I think is easiest to perhaps more complicated to sort through. The first issue I'd identify is that Magpie didn't take the kitchen equipment. And by that, I'm using kitchen equipment, as I did in the briefs, to refer to the kitchen hood that was installed and the sinks that were installed in the kitchen. They didn't take that equipment before the lease ended. When we look at the trade fixture cases, this is something that the cases clearly provide. If something is to be a trade fixture, it has to be removed before the end of the lease. Here we saw a few things happen. The lease gets terminated roughly 45 days after the fire incident at the neighboring building. The trial court upheld that and said that that was a proper termination based on the destruction to the property. The next thing that happens is counsel for the property owner sends communications to Magpie through the counsel. They'd say, hey, you need to come get anything that's yours. So at this point, Magpie was on notice that like, hey, anything that's ours, we should go get. So not only did they not take the kitchen equipment before the lease was up, they, in fact, didn't even take it after told, hey, come get your stuff. There's evidence in the record, testimonial evidence, that Magpie still had keys to the premises and was going in and out of the premises during the period. Basically, up until the time that they did come and they picked up some things that weren't attached to the property that the new owner, my client, UEP Investments, did allow them to take because they weren't attached to the property. So do you know why we're there? Opposing counsel is going to say there's a difference between the termination of the lease and expiration of the lease. What do you say about that? Your Honor, I would suggest that that leads to a kind of an absurd result in this particular case. At least I'd have to think through other cases. But here, what that would mean is that if the expiration wasn't, let's say, co-terminal with the termination, if those weren't the same thing, then basically Magpie would have the right to come back up until, let's say, all the time had expired under the lease as it was originally written before it was terminated. They'd be able to just, what, pop in and say, hey, we're here for our kitchen hood and we want to tear out these sinks. That makes no sense. And even if they're trade fixtures, they'd have to arrange to repair the property. It's just we end up in kind of a bizarre land if we're saying that basically a lease termination doesn't cause the expiration. And, Your Honor, I would note that the cases cited by my colleague basically are cases that involve holdover tenancy that you get into security deposit returns or holdover penalties where the tenant, usually residential tenant, is looking at this going, well, I didn't really think I had to be out. Like, there's confusion on that point. So here it's a little different. I don't see any way to see this that makes sense other than termination and expiration are synonymous for the purpose that we're talking about here. And I would suggest that the lease itself even is somewhat, it uses the terms interchangeably in different parts because there's a lease option that talks about expiration versus termination. They use the words, this lease was written by laypeople, and it uses those words kind of interchangeably. But, Your Honor, if that resolves your question, then I'll keep moving. It does. Thank you. Sure. And I think that's kind of it on that point. I don't have a lot more to say about that. I think it's pretty straightforward. Basically, she didn't pick the stuff up. Magpie didn't until about six months after the fire event and probably August to January after the termination and even after a warning in October. Moving on, damages is the second issue. Roughly, I would say there was no proper testimony on damages. I raised this issue at the midpoint in the case after plaintiff had rested its case. Frankly, there was Judge Fabiano, the trial court, looked at me and kind of said, oh, I think she, for Magpie, Ms. Calatroni, did say $34,000. And I said, I don't have that in my notes. So, basically, this is a motion for a directed verdict. This was the end of the trial day. So we all come back the next day, and there's, again, this kind of colloquy where I'm like, well, I have $34,000 written on a slip of paper, but not like in my notes from the main part of the trial, but sorry if I was confused. Then, of course, we get the transcripts, look back. There is no testimony about $34,000. I'm sure your clerk's smarter than I am and certainly you all. The way I tried to search, I read through the transcripts, obviously, but I also searched it for dollar signs, and there is no dollar sign $34,000 in the transcript, in the body of the trial. That came from plaintiff's opening argument, and then my colleague, to his credit, tries to spin kind of like a modern-day alchemist, tries to spin an allegation of the complaint into what he needs retrospectively. But the problem with that is, first of all, the allegation isn't in the count that is at issue today, the unjust enrichment count. Secondly, it was denied in the count that it was in by my client. Thirdly, that's not really how complaints work. The complaint was introduced at trial by the co-defendants. Essentially, they had some attachments to the complaint, or the complaint was an attachment to something, and they were talking about that set of documents. The $34,000 reference in the complaint was never discussed in court, nor did anybody ever say, hey, we move to have some admission about this fact or that this is a fact. Never happened. So the trial transcript is devoid of anything about $34,000. Really, all you get is a reference to $10,000, which was what Ms. Caltagirone indicated that Magpie paid for the kitchen hood or some part of it. But even that doesn't get them where they need to go because the standard for unjust enrichment damages is it's measured by the defendant's gain. It's not measured by even necessarily, I guess, the value of the item. But here we have no evidence about what the gain to the defendant was, my client. We have no evidence about the condition of the hood at the time of the, I'll call it a taking for shorthand. We have no evidence about its value at that point. We have no evidence about its use or the use really of the premises other than eventually was leased out for another restaurant. But to say, so I don't think there's any proper evidence of any damages under the unjust enrichment standard. And I think that ship has sailed for them. They rested their case essentially without damages evidence. Moving on, if none of your honors have any questions. The third point I would make is that the lease between the property owner, the Pirellos, Sam and Linda Pirello, and Magpie is relatively unambiguous. I don't think it's ambiguous at all, I guess. All such alterations, additions or improvements to the property. I'm sorry, I'll start that over. All such alterations, additions or improvements to the premises by the lessee, Magpie, shall become the property of lessor upon the expiration of the term of this lease. What the trial court in effect did was allow Magpie to use parole evidence to get into kind of revisionist history. If we take the lease on its face, these things that were attached to the property that went through this permitting process with the city building department, the city fire department. In the case of the sinks, I believe also the county health department. All these things that go through all these processes and then are attached to the premises. Basically, they are improvements to the premises. Those belong to the landlord at that point. So, the lease is unambiguous on that point. And this becomes again relevant later if we talk about trade fixtures versus regular fixtures. Because the best evidence of the intent of the parties is the lease. And there's other evidence that would go with that to show the intent. Does it matter whether they're trade fixtures or just regular fixtures if we accept the unambiguous language argument regarding the lease? Your Honor, I think the court would have to. So, I would concede the point the court would need to assess whether this was an alteration, addition, or improvement to the premises. So, in a way, that's kind of an intertwined question. I'm not trying to avoid your question, but I don't see a way to see something that is mounted, you know, designed, custom designed to go into space, mounted to the wall by bolts and hangers and things that causes damage when you pull it out. I don't see a way to say that it's not an addition and an improvement to the premises and increase the value of the premises, certainly. So, if the court, in a way, the court is kind of answering the same question, though, I would say the question of whether it's a trade fixture versus a fixture. I'm not sure you need to reach that, per se, as long as we accept that the kitchen hood and the sinks were alterations, additions, or improvements. And given the way they were affixed, I think it would be tough to say they're not. So, basically, I would argue that everything else that happened about, you know, the intent about the equipment is basically parole evidence. And we'll talk about that, actually, a little more now because now we're in the land of trade fixture versus regular fixture, three-part test under ANA market and NACOMAS. The most important factor is intent. So, as discussed, contract is, A, the best evidence of intent between the parties. Secondly, we have Sam Perrello's testimony indicating that he believed at the time the lease was entered and at the time that he conveyed the property, he and his wife conveyed the property to my client, he believed that the kitchen equipment were fixtures, additions to the property that came with the property. So, you have his intent. You have Ms. Caltagirone's and Bankpai's attempt to amend the lease after the fire incident while there was kind of an attempted workout before the termination, I believe. There's a letter from her, from Council Tom Rood of Rockford, saying, hey, we would like to amend the lease. Like, we'd like to look at getting back in there when you fixed it. I'm speaking roughly here. But one of the things we'd like to amend is that my client would like to be able to take her stuff out of the property, take this equipment out of the property if, in fact, the situation doesn't work out. So, for example, the building can't be put back together or whatever. So, even her attorney is saying basically that you wouldn't need that amendment if the lease meant that she could just take the stuff out. No need for the amendment. So, and then finally, when we look at Ms. Caltagirone's own testimony, when you look at anything other than the very specific question of was the kitchen equipment Magpies to remove, if you look at all of her other testimony, essentially, you've got her saying when she moved Magpie into the premises, it was intended to be a, quote, permanent location for Magpie. She liked that it was near, we had a new 13, 14 story hotel going in. It's in the core of downtown. There were other things she liked about it. She now, much after the fact, wants to revise her intent for this purpose to say, oh, no, no, that was stuff that could come out. Well, she didn't intend for it to come out because she always intended to have the premises. And the earliest part of this case was about Magpie contesting the fact that it no longer had a right of first refusal since the lease had been terminated. They thought that was improper because they wanted to end up owning the property. These things all suggest that the shred of testimony that's basically no, no, that was I intended to be able to take it out is basically revisionist history. The other factors in terms of trade fixtures, we have the nature of the attachment. The experts report, I believe I put in the appendix, John Bross testified about the lengthy steps that you go through in order to get approvals to put this thing in, how it's designed, you get the approvals. And even to take it out, you're going to damage the premises. And you would have to have arguably a demolition permit from the city to take it out. So the nature of the attachment is it's more than it was taken in there and set down like a pastry case or a point of sale system or even, you know, a soda fountain machine or something. This was something that was basically wired into the premises electrically, bolted into the premises in a serious way. I mean, it's a heavy piece of equipment. So the nature of the attachment, I believe, also favors finding that this is a fixture, not a trade fixture. The third factor is whether the object is essentially, basically essential to the use of the premises for its intended purpose. Here, a kitchen hood is kind of at the essence of having a commercial kitchen in a restaurant because you can't have your cooking equipment, grills and things like that in there without the kitchen hood. So basically, the restaurant would be incomplete without a commercial restaurant hood. And the same with the sinks. The health department won't let you operate the kitchen without the sinks, the little wash sinks. So, again, this favors, you know, these are not, for example, some of the cases that my colleague cited across the way. He basically looked at a case. There's one where there are whale casings, whale drill casings. And there's actually very specific rules about that from states that have lots of oil wells. And they say, no, those are trade fixtures. And if you think about it, though, if you took the drill and the oil casing, I guess, when I'm not an oil drill expert, took that off the property, you still have a blank piece of property, basically. Here, if you tear out the kitchen hood, you have to go through a whole re-permitting process if you want to have a kitchen again, a commercial kitchen. So, it's inherent to the use of the property. And that's why it was installed. And then my last point would be that in terms of unjust enrichment, that the parties aren't really in the right posture for that. Basically, my client gets the property from the Pirellos, the co-defendants. And the understanding between both my client and their client testified to was that this was – the kitchen equipment was part of the property. It's not like they went and scarfed it up out from under Ms. Caltagirone's and Magpie's noses. They just – basically, it was – it came with the property. It was part of the property. So, I think it's just a tough case to say that my client – my client didn't do anything wrong. There's no real claim of fraud or there's no claim that we somehow misled Magpie. It's – if anything, I would suggest that if Magpie doesn't like this outcome, that maybe that should have been part of her claim against the Pirellos because it's – we didn't affirmatively go seek this out and take this stuff. It was part of the property. So, your honors, if I may reserve the rest of my time. All right. Thank you, counsel. You will have an opportunity in rebuttal. Thank you. Yeah, please. Just as the appellate court, good morning and may it please the court. As stated, my name is Anderberg Zenich. I represent the appellee in this matter. Your honors, this case comes down to a straightforward question. When a tenant installs specialized restaurant equipment at their own expense, customized to their needs, and then wants to remove that equipment, can the new owner simply keep the equipment for free because the building burns? And the trial court correctly answered that question in the negative. And because of that, UEP Investments, that is Urban Equities Properties, UEP Investments was unjustly enriched and this court should affirm. And I find it kind of cool how counsel and I do agree very much on the issues here. First, that's whether the kitchen hood and sinks, whether those were fixtures or trade fixtures belonging to Magpie. Second is whether UEP was unjustly enriched. And third, whether the damage award is supported by the evidence. And this is where the trial court's findings come into effect. Just a friendly reminder to the court that the standard of review on this is manifest weight of the evidence when it comes to these findings. The appellate court does not reweigh evidence. It asks only whether the opposite conclusion is clearly apparent or if the finding by the trial court was arbitrary. In this case, it was not arbitrary and it is supported by the evidence. Counsel, would you agree the standard of review for interpreting the lease is de novo? Yes, Your Honor. Contract provisions leases would be followed under or reviewed under de novo. I'm just talking about the findings of fact in this part. Yes. Counsel and I also agree that there is the three part test regarding whether something is a trade fixture. And so Illinois courts, of course, apply this test. And I'm going to address head on the intent factor, that most critical factor that my colleague brought up in an argument. The evidence shows that Miss Caltagirone and Magpie installed this hood at their expense. And it was customized to their cooking equipment needs, not necessarily to the building's general configuration. I would contest Mr. Arduino's saying that, well, this was put in as a permanent place for Magpie. Just those last two words for Magpie, for this restaurant, not necessarily for this building. And this hood, these things, they were all designed around what was specifically needed to run this restaurant. And this is the hallmark of a trade fixture, something a tenant installs to carry on their trade. The appellant makes much of the lease language, providing that improvements become the lessor's property, quote, upon the expiration of the term. I would argue that this actually supports Magpie. Again, we've argued in our brief about expiration versus termination. Those have legal meaning. Counsel did bring up that this was drafted by lay people, not by lawyers. But nonetheless, the legal definitions would apply. And there is a distinction between expiration and termination. Expiration is the passage of time, whereas termination is an affirmative act by the landlord cutting the lease short. In their reply brief, and also brought up by counsel, was this creates a nonsensical or absurd result. And I'd like to address that head on. Does the lease terminate when it expires? I'm sorry, Your Honor. Could you repeat the question? Does the lease terminate when it expires? Yes, Your Honor, it would. Okay. But it does not necessarily expire when it terminates. And let me address that because I know that sounds a little weird. So what happens when, forgive me, Your Honor, I have to go to a different part of my notes. So I'm going to address that nonsensical argument that was made because that's where I can best tag it in. So the argument in their brief is that it creates a bizarre or nonsensical outcome, specifically that under magpie's theory, the kitchen hood and sinks would remain in the premises, purportedly belonging to magpie, while an entirely different business was occupying and using that property. However, that framing gets this situation backwards. If there is a nonsensical result in this case, it is this. A company accepts a building by quick claim leave for zero monetary consideration, physically prevents the prior tenant from retrieving property or equipment, rents that equipment to a new tenant, profits from it for a significant period, and then argues on appeal that it owes nothing because the prior tenant did not remove the property quickly enough. That's the result that we're being asked to find here. Moreover, in their brief, it frames the question assuming the conclusion. It says the hood and sinks would belong to magpie, while another tenant is using them, as if that is absurd. What is only absurd is if you already decided the items are not trade fixtures. If they are trade fixtures, and that is what the trial court found here, then a subsequent... I was going to ask you the same question that Justice Vance will ask you, Conan. Is the lease distinguished between fixtures and trade fixtures? I believe that there's ambiguity in the lease, Your Honor. So is the answer no? Is the answer no? I'm not prepared to answer that, Your Honor. This is so much easier if you just answer the question. The answer is no, Your Honor. There you go. All right. Go ahead. But I will continue my argument, Your Honor. If they are trade fixtures, as the trial court found here, then a subsequent occupant using magpie's equipment without compensation is exactly the kind of unjust enrichment the law is designed to remedy. See, what happened was the termination of the lease ended the landlord-tenant relationship and magpie's right to occupy the building. It did not end their right to remove trade fixtures, a separate legal right that exists independently of the lease. And it remained viable for a reasonable time afterward. That is what the case law says regarding trade fixtures. And so that is the nonsensical result addressing that argument. Counsel also talked about the nature of attachment factor. Pellant's expert testified at length about how difficult the hood would be to remove, but this court should note that difficulty of removal has never been the test. Hello. If I understood your opponent's argument, your client was notified about the contents and that she didn't respond or didn't go do anything about it. Is that true? Your Honor, I would have to go back to the record, but I do believe I saw some communications between counsel, I believe counsel in this case, and my client's counsel trying to figure out how to get into the building and do things. So it wasn't a non-responsive situation. I'd have to go back and look up that exhibit number in the record, but I do recall seeing that. So I believe there was communication. Counsel did bring up the Jones v. Joseph Greenspun Sun Pipe Corporation, which is the old case regarding piping and everything. The argument has been brought up in the brief, so I'm not going to rehash it here, but basically it is if a cemented well casing can be a trade fixture, so too can a kitchen hood. And then the other factor here is on adaptation to purpose. There's been a lot of talk about from counsel, or excuse me, a lot of debate with the case A&A Market v. Pekin Insurance Company. That is the case relied upon by counsel. I would just like to reiterate that that deals with fixtures, not trade fixtures, and that distinction matters because of the Nokomis case, Nokomis Quarry Company v. Deedle, which we've cited in our brief, that items attached by a tenant to carry on their trade are trade fixtures with different removal rights than ordinary fixtures. The other question is timeliness, which your Honor did, I believe, hint at in the question there. Even if the court finds that termination and expiration are synonymous in this context, Ms. Catalgeroni's removal attempt was thwarted by UEP. She showed up and she was told she could not remove items from the kitchen, even though she was allowed to remove other ones. She did not voluntarily abandon the hood and sinks and was prevented from that removal, and so a tenant should not be penalized for failing to remove property when the new property owner doesn't allow them to remove their fixtures. Do any of you, Your Honor, have any questions before I continue on? I do apologize that I've done a block of words at you. I thought opposing counsel had brought up to you that your client had keys and had an opportunity to go in there and remove things. Why didn't they take advantage of that opportunity to remove these items if they weren't permanently attached to the premises? Your Honor, looking back at the record, and I should also say I was not trial counsel on this one. I'm only a counsel on appeal. But I would refer you back to the record to the exhibits. I can look them up really quickly if you wanted me to, or I can look them up at the end, but there is communication on that one. But this building burned, and so my conjecture, just me representing to the courts, I believe it probably would have been safety questions at that time. I thought the building next door burned and that this building suffered some damage as a result. And that, Your Honor, would be reflected in the record. Again, I have not laid eyes on the building, and the record is testimony. There were no graphs or anything that I was able to refer to. Okay. Moving on to the unjust enrichment argument, Your Honors. To establish unjust enrichment, MAGPIE has to show that UEP unjustly retained a benefit to MAGPIE's detriment in violation of principles of justice and good conscience. That's taken from Martus v. Pekin Memorial Hospital, which we cited in our brief. And those elements are satisfied. UEP received a functioning commercial kitchen with hood, fire suppression system, sinks, all of these installed, and then used that kitchen to immediately lease the space to a new restaurant operator. The trial court expressly found that UEP got, quote, the value over the last few years to use, end quote, of equipment it never paid for, and that is unjust enrichment. In their brief, the appellant argues, note that there's no direct relationship between UEP and MAGPIE, which would shield them from liability for unjust enrichment. But Illinois law does not require a direct relationship when a benefit is transferred through a third party. Unjust enrichment is available when the plaintiff had a better claim to the benefit than the defendant. And MAGPIE installed this equipment. MAGPIE paid for it. They designed it. And so, therefore, MAGPIE has a better claim to it than UEP, who received it for free as part of a no consideration quick claim deed transfer. Would your argument be any different if UEP paid some monies for the building? I don't think it would be, Your Honor. And the reason is because the enrichment would be the property was still taken. So even if they had paid for the building, MAGPIE never saw the benefit of that value reaching them. And then the appellant finally argues in the section that the lease bars the unjust enrichment claim. This is where the lease is between MAGPIE and the Pirellos, Your Honors, not between MAGPIE and UEP, and UEP was not an assignee of the lease. The evidence does not establish that UEP assumed the lease, and the transfer of trade fixtures from the Pirellos to UEP falls entirely outside of the scope of the lease. And so, therefore, the lease doesn't govern in that case. The relevant inquiry, as I said, is whether the claim falls outside of the contract as this one does, because UEP was never a party to it. My final part, Your Honors, as I see my time ticking, is the damages award. I will agree with counsel, Your Honors, that there is one mark of testimony from my client, Ms. Caltagirone, and the complaint. Those are the two pieces of evidence that give us dollar figures. As part of my argument, that testimony is, again, a finding of fact, or excuse me, the finding by the trial court is a finding of fact, and the question is whether or not their finding was arbitrary or whether it was against the evidence. There is statement that the hood itself, the hood alone, cost over $10,000 by itself. Ms. Caltagirone has experience in the field, firsthand knowledge of what that equipment cost, and her testimony was not contradicted by any defense witness of value, on the value of that. We also had the defense that did put in the other defendants who put in the complaint. My argument, Your Honors, that is a statement. It is a verified statement. It is not testimony, but what it does is it corroborates Ms. Caltagirone's testimony as to value. Was the complaint admitted for a factual purpose? Well, Your Honor, let me consult my notes here. Let me listen. Forgive me, Your Honors, while I search my notes here. I understand you didn't do the trial, but you did the appeal, right? That is correct, Your Honor. I did the brief and everything. Because it was confusing, because it looked like it came in, Your Honor. It was never argued on any part of the record, but it wasn't admitted for a limited purpose from what I was able to gather. It was or was not? It was not. The permits, which were Plaintiff's Exhibit 2, and those do speak to value, but those were only for a limited purpose, which was to show that they were properly permitted, and that was what the trial court allowed them in. But the complaint itself, I did not see any limitation on. If I'm making a mistake, I will happily correct that in the next five minutes if I can find it. So, Your Honors, to just bring the damages award section here to an end, the trial court observed that the hoods and sinks were, quote, not particularly old, just a couple of years, end quote, at the time of the dispute, and the court was entitled to use that context to arrive at a reasonable value estimate. That is precisely the role of the trial court as the finder of fact. The appellant's argument that the proper measure is UEP's gain, not MAGPIE's loss, actually helps MAGPIE here, because UEP received a fully functional commercial kitchen that it immediately used to attract a restaurant tenant, and the $34,000 figure reasonably approximates the value of using that equipment. So, after a full day of testimony from multiple witnesses, reviewed documents, expert opinions, with credibility determinations made by the trial court, the trial court concluded that Ms. Caltageroni installed the trade fixtures at her own expense and that she attempted to retrieve them before the lease expired, and that UEP had prevented that retrieval. UEP profited from that equipment for years, and therefore, reversing that judgment would reward UEP for those efforts. It would also signal that a new property owner can accept a no-consideration transfer of a damaged building, keep the prior equipment, lease the space, and face no accountability in this case, even though there was significant expense towards a specific trade, and therefore, this court should affirm the trial court's judgments in all respects. I'm happy to answer any questions. Otherwise, I'd be free to yield my time. I've seen none. Thank you, counsel. Thank you, Your Honors. Counsel, I think you're calling. Thank you, Your Honor. I'll take these just kind of in a somewhat random order, but the monetary consideration issue that came up a few times, basically, the building was taken subject to a demolition order by the city or approaching a demolition order by the city with a laundry list of things that had to be repaired about the building. This is all in the testimony in the exhibits. Essentially, a wall had to be reattached to the building, as is probably one of the biggest things. The roof had holes in it, and through skylights, had holes in them. All the building's electrical systems had to be replaced. So it's not like my client received this perfectly functioning little building and had no risk. Really, the consideration was the Perillos, and this is within the testimony, Perillos would have had to demolish the building or bring it up to code. They did not want to, could not do either of those with the insurance money they got. It wasn't enough. They didn't want to. They just said, we can't deal with this, basically. So there was consideration, contrary to Magpie's argument. Secondly, I would just note that my colleague uses cost almost interchangeably with value as to the $10,000 that was blurted out regarding the hood. Not the same thing. I don't think I need to harp on that. It just is not the same thing. Thirdly, it was the neighboring building fire, Your Honor, that you correctly identified. It was not this building on fire. This building suffered from the water intrusion because a five-story taller building next door had probably millions of gallons of water rain down on it and in turn some of that and bricks came through this building. I would point out on the unjust enrichment issue that the trade fixtures are within the lease. They are dealt with in an express contract. Basically, what Ms. Caltadrone and Magpie are trying to do now is shift the burden. They want to basically get a different resolution because they don't like what they agreed to in the lease. So that's why I'm opposed to an unjust enrichment solution here. One of the reasons. Finally, a couple of Your Honors brought these issues up, but our initial brief at page four, there's a block of summary of my letter on October 4th, the Pirellos instructed Magpie to remove Magpie's property from the premises, providing a 10-day window to do so. Citation to A35 in the appendix or E98 in the record. Otherwise, the property would be deemed abandoned. Same citation. Sam Pirello testified that Ms. Caltadrone still had keys to the premises for some time after the lease termination. Record at 234, 235. And she was going in and out of the premises with, sorry, after the lease termination without authorization. Same citation. And she had physical access to the premises, at least through November of 2017. So at that point, you're well over August, September, October, November. I mean, you're three months out from the termination. You're more months out from the fire incident. And if you look at the actual language of Nokomis, it tells us that before the lease expires, the tenant would be allowed to remove a trade fixture so long as the tenant did not damage the realty in the process of the removal, quote, before the lease expires. So, Your Honor, I think that's it. I would just ask that the court reverse the decision below, primarily on the de novo review of the lease. But more centrally, I think, frankly, the damages assessment is contrary. It is arbitrary. So thank you, Your Honors. All right. Counsel, thank you for your argument. The court will take this matter under advisement. The court stands in recess.